Stewart **DICKLER**; Beech Tree Run, Inc.; Wantagh Union Free School District, Appellants in No. 91–1357,

v.

**CIGNA PROPERTY AND CASUALTY COMPANY**, Pacific Employers Insurance Company, Appellants in No. 91–1302.

Nos. 91–1302, No. 91–1357.

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1991.

Decided Feb. 27, 1992.

Rehearing and Rehearing In Banc Denied March 24, 1992.

Lewis Kates (argued), Lori Nash, Lewis Kates Law Offices, Philadelphia, Pa., for appellants in No. 91–1357 and cross-appellees in No. 91–1302 Stewart Dickler, Beech Tree Run, Inc. and Wantagh Union Free School Dist.

Stephen A. Cozen (argued), Thomas M. Regan, Richard C. Bennett, Cozen and O'Connor, Philadelphia, Pa., for appellees in No. 91–1357 and cross-appellants in No. 91–1302 CIGNA Property & Cas. Co. and Pacific Employers Ins. Co.

Before BECKER, GREENBERG and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal presents for our review the District Court's non-jury judgment in favor of the plaintiffs Stewart Dickler, Beech Tree Run, Inc. and Wantagh Union Free School District (the "Dickler Group") under an insurance policy with defendants CIGNA and Pacific Employers Insurance Company ("CIGNA").[1] The District Court, while denying punitive damages, awarded compensatory damages of $7,381,490 to the Dickler Group for the loss of certain school premises that had been destroyed by fire. Deferring in large part to the District Court's findings, we agree that the Dickler Group is entitled to compensatory damages and is not entitled to punitive damages. Our interpretation of the policy's provisions, however, results in a damage award which differs from that found by the District Court in that we hold that the District Court overestimated the building's replacement cost and failed to find and subtract an amount for physical depreciation in order to calculate actual cash value.

Thus, we will instruct the District Court to modify its order so as to award the Dickler Group the building's replacement

---

1. Pacific Employers Insurance Company is a wholly-owned subsidiary of CIGNA.

cost, which we hold to be $5,389,208, less an amount for the building's physical depreciation. Because the District Court excluded the Dickler Group's evidence regarding the building's physical depreciation but admitted CIGNA's physical depreciation figure of $3,043,383, the District Court should allow the Dickler Group to either stipulate to a physical depreciation amount of $3,043,383, and thus accept an award of $5,389,208 less $3,043,383, or the District Court must determine the amount of physical depreciation after a hearing limited solely to that issue. In addition, we will instruct the District Court to award the Dickler Group $180,000 for demolition costs and provide in its order for interest and for CIGNA's obligations in the event the Dickler Group undertakes to rebuild.

### I.

In August of 1986, the Wantagh Union Free School District ("School District") contracted to sell a former schoolhouse to Stewart Dickler for $2,175,000. The parties agreed to delay the closing while the school district sought, and eventually received, voter approval for the sale.

On June 27, 1988, less than three months before the scheduled closing, a fire destroyed a substantial part of the building. As a result, the School District could not deliver the building to Dickler in the contracted-for condition but instead assigned to Dickler the proceeds of any insurance recovery. Dickler, in turn, assigned those rights to Beech Tree Run, Inc., a company he and his associates had formed to serve as owner and ultimate developer of the site.

The building, along with eight other buildings owned by the School District, was insured against loss by fire under a $49,015,070 insurance policy issued by CIGNA. The policy provided that, in the event of property loss, CIGNA would compensate the insured for the property's actual cash value. Alternatively, the policy provided that an insured who repaired or replaced the property would receive full replacement cost:

> [i]f there is a loss to covered property, we will use either the *"replacement cost"* method or the *"actual cash value"* method to calculate its value.... We will only use the *replacement cost* method if you actually repair or replace the damaged property....

(A. 983a). The policy defined "replacement cost" as "the amount it would take to replace property with property of the same kind and quality, determined at the time of loss" (A. 1002a), and "actual cash value" as "the replacement cost, at the time of loss, of the property damaged or destroyed, less depreciation." (A. 999a). The policy did not define "depreciation."

Under the policy, an insured could opt to initially receive compensation for the damaged building's "actual cash value" and then, if the property was rebuilt within one year of the loss, would receive the difference between the building's actual cash value and its replacement cost:

> If you choose, we will use the *actual cash value* method to settle losses for property that would normally be valued on a replacement cost basis. If you make this choice, you can change your mind and have us change back to the replacement cost method at any time within one year after the loss. However, you will only have this privilege if you actually rebuild or replace the damaged property.

(A. 983a). In such cases, the actual cash value award would provide capital to allow rebuilding to commence.

The Dickler Group, which did not itself possess a copy of the policy, engaged a public adjuster to represent its interests and to file and process its claim with CIGNA.[2] The public adjuster communicated with CIGNA and requested a copy of the policy in order to "know the terms and conditions ... for the adjustment." CIGNA did not respond and took no action to adjust the loss. The public adjuster then retained Casella Construction Company

---

2. Consistent with the School District's assignment of the insurance proceeds to Dickler, the School District had its superintendent sign the retainer agreement with the public adjuster.

("Casella") to estimate the fire damage. On October 3, 1988, Casella estimated the replacement cost of the entire building to be $5,103,040 and estimated that the fire had destroyed 55% of the building. Casella did not estimate the building's actual cash value because the Dickler Group's adjuster, not having access to a copy of the policy, apparently was unaware that the policy required a determination of actual cash value before the insured could receive any funds prior to rebuilding.[3] A copy of Casella's report was forwarded to CIGNA, which still took no action to negotiate with the Dickler Group.

Unbeknownst to the Dickler Group, CIGNA's adjuster retained an appraiser named Jonathan Held to estimate the damaged building's actual cash value. Held started with Casella's replacement cost estimate of $5,103,040 and subtracted several factors that, in his view, constituted the difference between replacement cost and actual cash value:

> I looked at all factors that I believe should be included in the determination of actual cash value. I looked at replacement cost. I looked at depreciation. I looked at physical damage. I looked at pre-loss market value. I looked to see if there was any difference in the market value prior to the loss and after the loss. And I looked at the highest and best use of the site and whether or not there were any feasible, legal or viable uses for the building.

(A. 424a). Held concluded that the damaged property had no actual cash value. He based this conclusion primarily on his determination that, after having ceased to serve as a school, the building had no profitable use and had actually decreased the value of the three and one half acres of prime residential real estate on which it stood. At the time that Held performed his calculations, he did not know that the policy defined actual cash value as replacement cost less depreciation. (A. 444a–445a). CIGNA did not at any time inform the Dickler Group of Held's conclusions or attempt to negotiate and adjust the loss.

After a significant time had elapsed and CIGNA had still not provided the Dickler Group's adjuster with a copy of the policy or taken any other step to facilitate adjustment of the loss, the Dickler Group's lawyer asked CIGNA for a copy of the policy. CIGNA refused to comply with this request. Meanwhile, the Town of Hempstead, in which the building was located, fearing that the damaged building posed a danger to the public, pressured the Dickler Group to either repair the fire damage or to demolish the building. In April, 1989, almost nine months after the fire, the Dickler Group chose the latter option. Demolition costs totalled $180,000, constituting a $185,000 demolition fee less a $5,000 rebate for early payment. (A. 159a).

In June, 1989, CIGNA requested the Dickler Group to submit a proof of loss within sixty days. The Dickler Group retained Harvey Stark, a consulting engineer, to determine the replacement cost of the building. Stark estimated the building's replacement cost at $7,381,490. The Dickler Group submitted Stark's report to CIGNA as its proof of claim. By letter dated August 30, 1988, CIGNA rejected the Dickler Group's proof of claim for lack of compliance with the formula set forth in the policy. CIGNA did not enclose a copy of the policy in its August 30 letter.

In September, 1989, after several further attempts to procure a copy of the policy had failed and after CIGNA had continued in its refusal to negotiate with the Dickler Group, the Dickler Group commenced suit against CIGNA in the Pennsylvania state courts. Pursuant to a discovery request, CIGNA provided the Dickler Group with what it represented to be the policy. The parties resolved the state court action by agreeing that the Dickler Group would submit a new proof of loss that accorded with the terms of the policy that CIGNA had provided to the Dickler Group; that CIG-

---

**3.** The Dickler Group's adjuster testified at trial that, while he recognized that replacement cost policies generally require rebuilding before replacement cost is awarded, he believed that the initial, pre-rebuilding award would be the insurance company's good-faith advance on the replacement cost rather than an award of the building's actual cash value. (A. 132a).

NA would conduct an investigation of the loss; and that, if the Dickler Group were to bring another suit against CIGNA, it would do so only in federal court no later than June 27, 1990. Subsequent to the suit's dismissal, the Dickler Group discovered that the policy that CIGNA had provided in response to the discovery request was not, in fact, the policy that had been in effect at the time of the fire.

The Dickler Group submitted to CIGNA a second proof of loss, also based on Stark's estimate. CIGNA did not respond directly to this proof of loss, but instead instituted a declaratory judgment action against the Dickler Group in the United States District Court for the Eastern District of New York in May of 1990. CIGNA withdrew its action after the Dickler Group moved to dismiss the suit for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

On June 27, 1990, having received neither a response to its second proof of loss nor a copy of the relevant policy, the Dickler Group brought an action against CIGNA in the United States District Court for the Eastern District of Pennsylvania. All parties agreed that New York law governed the dispute because the insurance contract had been negotiated in New York and the insured property was located in New York.

The Dickler Group alleged that CIGNA had breached its insurance contract by failing to provide compensation for the property loss. The Dickler Group also alleged that CIGNA had acted in bad faith by failing to provide a copy of the policy; by falsely representing another policy to be the effective policy; by unjustifiably refraining from adjusting the loss and compensating the Dickler Group; and by instituting a frivolous lawsuit in the Eastern District of New York for the purposes of delay or harassment. Dickler sought compensatory and punitive damages.

CIGNA responded that, because the building had not been repaired or rebuilt, the contract only entitled the Dickler Group to the building's actual cash value which, in CIGNA's view, was zero. CIGNA also argued that, under New York law, punitive damages are not available for a breach of an insurance contract absent a showing of a systematic scheme aimed at defrauding the general public. On January 28, 1991, the District Court, agreeing with this assessment of New York insurance law, granted CIGNA's request for partial summary judgment against the Dickler Group on the issue of punitive damages.

A bench trial on the issue of compensatory damages lasted from February 12, 1991 until February 14, 1991. At trial, Dickler testified that he had initially intended to demolish the building and to construct single houses on the site but that a downturn in the real estate market had convinced him instead to transform the existing building into a nursing home.

Harvey Stark, the engineer whose June, 1989 estimate of the building's replacement cost had served as the basis for the Dickler Group's proofs of claim, testified as the Dickler Group's expert witness regarding the building's value. Although Stark had initially estimated the building's replacement cost at $7,381,490, he had based that estimate solely on his own physical inspection of the building and on his examination of several photographs. Sometime after producing that initial estimate, however, Stark had obtained complete plans and specifications for the building and had produced a new report estimating the buildings replacement cost to be $5,389,208. At trial, Stark testified that this latter report represented "the true, accurate figures ... determined and checked by a total team of three people." (A. 361a–362a).

Jonathan Held, CIGNA's appraiser, testified as CIGNA's expert witness regarding the building's value. Consistent with the report that he had prepared for CIGNA's adjustor, Held testified that the building had no actual cash value at the time of the loss.

The District Court issued its opinion on April 1, 1991. In its findings of fact, the Court held that the Dickler Group had intended to repair the damaged building but had not possessed the financial resources to finance those repairs because CIGNA

had wrongfully refused to adjust the loss and to pay the building's actual cash value. (A. 506a) The District Court also held that CIGNA's refusal to adjust the loss with the Dickler Group had caused a delay that necessitated the building's demolition. (A. 507a).

In its conclusions of law, the District Court held that, pursuant to the insurance policy, CIGNA should have initially compensated the Dickler Group with the building's actual cash value and should have supplemented the award to equal the building's replacement cost had the Dickler Group repaired or replaced the building within a year of the loss. The Court then held that, because CIGNA's refusal to adjust the loss and to provide the initial actual cash value award had prevented the Dickler Group from repairing or rebuilding and had thus caused the building's demolition, CIGNA was responsible to pay the building's full replacement cost. The Court granted the Dickler Group $7,566,490 in compensatory damages, constituting the sum of Stark's initial replacement cost estimate of $7,381,490 and demolition costs of $185,000.

The Dickler Group and CIGNA both appealed the District Court's ruling and the two appeals were consolidated. The Dickler Group at 91–1357 asks us to reverse the District Court's partial summary judgment order in which the District Court ruled that New York law precluded punitive damages in this case. The Dickler Group argues that CIGNA had exhibited sufficient bad faith to warrant the imposition of punitive damages.

CIGNA at 91–1302 asks us to reverse the District Court's award of $7,381,490 in compensatory damages. First, CIGNA argues that the insurance contract only required a payment of the building's actual cash value and that the actual cash value of the damaged building at the time of the loss was zero. Second, CIGNA argues that, even if the building did not have an actual cash value of zero, CIGNA should only be held liable to pay the actual cash value of the portion of the building that was destroyed by fire and should not be

held liable for the building's subsequent demolition. Third, CIGNA argues that the District Court erred by relying on Stark's initial replacement cost estimate of $7,381,490 because Stark had revised this estimate to $5,389,208. Finally, CIGNA argues that the District Court should not have required CIGNA to pay $185,000 for demolition costs because the Dickler Group had received a $5,000 rebate from the demolition company.

We have plenary review over the District Court's conclusions of law and over its conclusions regarding the legal operation of the insurance contract. *See Linder v. Inhalation Therapy Services, Inc.*, 834 F.2d 306 (3d Cir.1987). We may reverse the District Court's findings of fact only if they are clearly erroneous. *See Cooper v. Tard*, 855 F.2d 125, 126 (3d Cir.1988).

**II.**

The District Court held that, under New York law, the Dickler Group had failed to state a valid punitive damages claim against CIGNA. Dickler appeals this ruling and claims that the District Court's findings of fact regarding CIGNA's wrongful refusal to adjust the Dickler Group's claim justified a punitive damage award.

We believe that CIGNA acted in bad faith in refusing to negotiate and adjust the loss with the Dickler Group. Also, although the evidence respecting the furnishing of CIGNA's policy to the Dickler Group, or to Dickler and Beech Tree Run, Inc. as part of that group, is somewhat unclear and equivocal, the findings made by the District Court fully support our conclusion that at least Dickler and Beech Tree Run, Inc. had been improperly refused a copy of CIGNA's contract of insurance, thereby precluding any actions on their part to minimize the post-fire loss or to comply with the explicit terms of a policy not available to them. (A. 502a, 506a). We cannot say that these findings made by the District Court were clearly erroneous.

■ Nevertheless, we agree with the District Court that New York courts require even more than a showing of bad

faith on the part of an insurer before punitive damages may be awarded. New York courts have allowed punitive damages against an insurer only where the insurer's behavior constituted a "gross and wanton fraud upon the public" and not simply a bad faith breach of one particular insurance contract. *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961). *See also Holoness Realty Corp. v. New York Property Ins. Underwriting Ass'n*, 75 A.D.2d 569, 427 N.Y.S.2d 264, 265 (1980) ("A claim for punitive damages against an insurer is cognizable in New York only in circumstances where a plaintiff has made sufficient evidentiary allegations of ultimate facts of a fraudulent and deceitful scheme in dealing with the general public as to imply a criminal indifference to civil obligations.").

In light of this stringent standard, the District Court correctly determined that the Dickler Group's punitive damages claim did not state a valid cause of action. The Dickler Group's complaint addressed only acts arising out of a single insurance claim and was wholly bereft of allegations of "gross and wanton fraud against the public." We will therefore affirm the District Court's ruling and partial summary judgment order of January 29, 1991 which rejected the Dickler Group's claim for punitive damages.

### III.

#### A.

We next address CIGNA's challenges to the District Court's compensatory damage award. CIGNA argues that the District Court erred by permitting recovery on a replacement cost basis rather than on the basis of the building's actual cash value.

Under the terms of the insurance policy, the Dickler Group had the right to receive the actual cash value of whatever part of the building was destroyed. The policy also granted the Dickler Group the right to rebuild within one year of the loss and to be reimbursed for the difference between the actual cash value already received and the replacement cost:

[i]f there is a loss to covered property, we will use either the *'replacement cost'* method or the *'actual cash value'* method to calculate its value....
We will only use the *replacement cost* method if you actually repair or replace the damaged property....
If you choose, we will use the *actual cash value* method to settle losses for property that would normally be valued on a replacement cost basis. If you make this choice, you can change your mind and have us change back to the replacement cost method at any time within one year after the loss. However, you will only have this privilege if you actually rebuild or replace the damaged property.

(A. 983a). As the District Court recognized, the effect of these provisions was to make actual repair or replacement of the building a necessary precondition for recovery on a replacement cost basis.

■ However, despite the clear language of the policy, the District Court held that the equities in this case justified an award of full replacement cost without a concomitant obligation on the part of the Dickler Group to replace or rebuild. Yet, New York law requires courts to enforce insurance policies as written and does not allow the circumvention of clear terms of insurance policies through judicial construction. In *Government Employees Ins. Co. v. Kligler*, 42 N.Y.2d 863, 397 N.Y.S.2d 777, 366 N.E.2d 865 (1977), the New York Court of Appeals expressed this doctrine as follows: "While it is true that policies of insurance are to be construed liberally in favor of the insured and strictly against the insurer, where the provisions of the policy are clear and unambiguous, they must be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement." *Id.*, 397 N.Y.S.2d at 778, 366 N.E.2d at 866.

The District Court relied on *Zaitchick v. American Motorists Ins. Co.*, 554 F.Supp. 209 (S.D.N.Y.1982), *aff'd without opinion*, 742 F.2d 1441 (2d Cir.1983), *cert. denied*, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983), a case in which the District Court

for the Southern District of New York applied New York insurance law to a dispute over damages arising from a fire that completely destroyed a house. The insurance policy in *Zaitchick,* like the present policy, allowed for payment of either actual cash value or replacement cost and required the insured to actually replace the house before receiving a replacement cost award. The defendant insurance company in *Zaitchick* was found to have wrongfully refused to pay the insured the actual cash value of the house, which was determined to be $37,000. Because of this wrongful denial of benefits, the insureds could not finance the replacement of their home. After considering the equities of the situation, the *Zaitchick* Court awarded full replacement cost of $70,000 and explained that "[i]n the instant case, plaintiffs were refused any monies under the insurance contract. Not surprisingly, they were unable to replace their home. This conduct by defendant [insurance company] made it impossible for plaintiffs to fulfill the condition precedent, and therefore, excuses plaintiffs from performance of the replacement condition." *Id.* at 217.

While the logic of *Zaitchick* has much to commend it, we do not believe that *Zaitchick* justifies a replacement cost award in our case. First, *Zaitchick* was decided by a federal district court pursuant to its diversity jurisdiction and consequently has no precedential value and cannot serve to justify a departure from the clear contractual language of CIGNA's policy. Second, in the absence of New York authority allowing payment of replacement cost without repairs, we do not find *Zaitchick* per-

suasive in the present context. Finally, the equities in *Zaitchick* were far different from the equities in our case: *Zaitchick* involved an elderly couple whose only home was destroyed by fire, whereas our case takes place in a commercial setting and involves relatively sophisticated parties. The windfall that the Dickler Group would enjoy if awarded full replacement cost without rebuilding had no parallel in *Zaitchick.*

We recognize that, in light of CIGNA's improper refusal to inform the Dickler Group of its rights under the policy, an award of the building's actual cash value as at the time of the loss, with nothing more, would deny the Dickler Group its contractual right to receive the full replacement cost after rebuilding. The policy limited the time within which the Dickler Group could replace the building to one year from the date of the loss. However, CIGNA apparently did everything it could to prevent the Dickler Group from learning of its contractual right early enough to implement that right within the relevant period of time. Also, CIGNA's refusal to adjust the loss denied the Dickler Group funds which could have been used to commence rebuilding.[4] We will therefore instruct the District Court to modify its judgment so as to allow the Dickler Group one year to rebuild from the time that it receives compensation for the building's actual cash value and to order that, should the Dickler Group rebuild within that year, the Dickler Group shall receive a supplemental payment as required by the insurance policy such that the total recovery would equal the building's replacement cost.[5]

---

**4.** We acknowledge the argument made by CIGNA that the Dickler Group has no intention to rebuild the school or to rebuild a comparable structure. However, the District Court found that "the Plaintiffs desired ... to have the [building] repaired and converted to another reasonably available use," (A. 505a), and, in light of the record, we cannot say that the District Court's finding was clearly erroneous.

**5.** Because the insureds did not fulfill their contractual obligation to repair within one year after the date of the fire, Judge Becker would foreclose the possibility of the Dickler Group recovering under the replacement cost method.

He believes that the governing policy clearly required rebuilding for the insureds to recover under the replacement cost method, and that the record demonstrates that the insureds did not rebuild within one year after the date of the fire. Therefore, consistent with the majority's rejection of importing the equitable principles of *Zaitchick* to this case, Judge Becker would also preclude recovery based on replacement within one year from the date of judgment. Judge Becker believes that such strict construction of the contract more closely accords with New York insurance law. *See Government Employees Ins. Co. v. Kligler,* 42 N.Y.2d 863, 397 N.Y.S.2d 777, 778, 366 N.E.2d 865, 866 (1977).

■ CIGNA argues that it should only pay for the actual cash value of that portion of the building that was destroyed by the fire and not for the portion that was demolished in April, 1989. We disagree. The insurance policy provided that "[a]fter a loss, you must ... take all reasonable steps to protect your property from further loss or damage. If you fail to do so, we won't cover any loss that results from your neglect." (A. 602a). The corollary of this provision is that CIGNA *will* cover losses that do not result from the Dickler Group's neglect. Because the District Court has made findings, supported by substantial evidence in the record, that the building's demolition resulted from CIGNA's unjustified inaction and not from the Dickler Group's neglect, (A. 506a–507a), we hold that CIGNA must pay the actual cash value of the entire building.

■ We note that, even in the absence of contractual language, New York case law supports this holding. Under New York insurance law, if the costs to repair a fire-damaged building exceed 50% of the building's value, the building is considered a total loss and the insured is entitled to a 100% recovery. *See Corbett v. Spring Garden Ins. Co.*, 155 N.Y. 389, 50 N.E. 282 (1898).

### B.

We next must determine how to calculate "actual cash value." Insurance contracts often fail to define "actual cash value," leaving that task to the courts. Courts confronting such contracts have defined the term "actual cash value" in essentially three ways: 1) as fair market value;[6] 2) as replacement cost less depreciation,[7] and 3) according to the "broad evidence" rule.[8] The "broad evidence" rule allows the fact-finder to take into account all pertinent evidence on the subject of value including, "the cost of restoration or replacement of the building less depreciation; the age of the property; the economic value of the property; the condition in which the property is maintained; the income derived from the building's use; the property's location; the degree of obsolescence, both structural and functional; the profit likely to accrue on the property; the material of which the building is composed; the market value; the opinions regarding value given by qualified witnesses; the potential gainful uses to which the building might have been or may be put; the building's value for purposes of rental; and any other facts disclosed by the evidence which may possibly throw light on the actual value of the building at the time of loss, including the property's salvage value, if any." *Insuring Real Property* § 24.04(2) at 24–30 (Stephen A. Cozen, ed., 1989).

In *McAnarney v. Newark Fire Ins. Co.*, 247 N.Y. 176, 159 N.E. 902 (1928), a case that involved malt production factories that could no longer be used for their intended

---

Although the Dickler Group argues that they were unaware of their duty to rebuild because CIGNA temporarily refused to provide them with a copy of the policy, Judge Becker is unpersuaded, because more than one year has passed since CIGNA provided Dickler with a copy of the policy. Therefore, he would not allow one year from the date of judgment for the Dickler Group to effect repairs.

**6.** *See, e.g., Jefferson Ins. Co. of New York v. Superior Court of Alameda County*, 3 Cal.3d 398, 90 Cal.Rptr. 608, 475 P.2d 880 (1970); *Aetna Life and Cas. Co. v. Little*, 384 So.2d 213 (Fla.App. 1980); *Gendron v. Pawtucket Mut. Ins. Co.*, 384 A.2d 694 (Me.1978); *Ottenheimer v. Real Estate Div. of the Nevada Dept. of Commerce*, 97 Nev. 314, 629 P.2d 1203 (1981); *United States Fire v. Stricklin*, 556 S.W.2d 575 (Tex.Civ.App.1977); *National Fire Ins. Co. of Hartford v. Solomon*, 96 Wash.2d 763, 638 P.2d 1259 (1982).

**7.** *See, e.g., Reliance Ins. Co. v. Orleans Parish School Bd.*, 322 F.2d 803 (5th Cir.1963); *Fedas v. Insurance Co. of State of Pennsylvania*, 300 Pa. 555, 151 A. 285 (1930); *Manduca Datsun, Inc. v. Universal Underwriters Ins. Co.*, 106 Idaho 163, 676 P.2d 1274 (App.1984); *Lee v. Providence Washington Ins. Co.*, 82 Mont. 264, 266. P. 640 (1928); *Clemon v. Occidental Fire & Casualty Co. of N. Carolina*, 200 Neb. 469, 264 N.W.2d 192 (1978); *Richfield Oil Corp. v. Harbor Ins. Co.*, 85 Nev. 185, 452 P.2d 462 (1969).

**8.** *See, e.g., McAnarney v. Newark Fire Ins. Co.*, 247 N.Y. 176, 159 N.E. 902·(1928); *Pinet v. New Hampshire Fire Ins. Co.*, 100 N.H. 346, 126 A.2d 262 (1956); *Messing v. Reliance Ins. Co.*, 77 N.J.Super. 531, 187 A.2d 49 (1962); *Worcester Mut. Fire Ins. Co. v. Eisenberg*, 147 So.2d 575 (Fla.App.1962).

purpose because of the National Prohibition Act, the New York Court of Appeals interpreted the undefined term "actual cash value" in New York's standard fire insurance policy. The Court rejected both "market value" and "replacement cost less depreciation" as appropriate definitions of "actual cash value" and instead adopted the "broad evidence" rule. CIGNA argues that, because New York law applies to our case, *McAnarney* requires us to define actual cash value in accordance with the "broad evidence" rule. Indeed, CIGNA's expert witness on the subject of the building's value initially reached his conclusion regarding the building's lack of actual cash value by employing the "broad evidence" rule, which allowed him to take into account his belief that the building's existence precluded more profitable uses of the land on which the building stood. (A. 658a).

■ However, we cannot ignore the language of the contract in this case, which defined actual cash value as replacement cost less depreciation. New York courts only apply the "broad evidence" rule when the insurance contract, like New York's standard fire policy, does not itself define "actual cash value." When the parties to an insurance contract agree to define actual cash value as replacement cost less depreciation, the broad evidence rule does not apply, *see, e.g., Lazaroff v. Northwestern Nat. Ins. Co. of Milwaukee, Wis.,* 121 N.Y.S.2d 122 (N.Y.Sup.1952), and potential alternate uses of the land may not properly be taken into account in determining actual cash value.

■ CIGNA has attempted to blur the distinction between the "replacement cost less depreciation" rule and the "broad evidence" rule by positing a very broad definition of the term "depreciation." CIGNA would have us define "depreciation" to include all of the factors that go into calculating actual cash value under the "broad evidence" rule. However, New York courts have consistently distinguished between the "broad evidence" rule and the "replacement cost less depreciation" rule, regarding them as mutually exclusive. In

*Gervant v. New England Fire Ins. Co.,* 306 N.Y. 393, 118 N.E.2d 574 (1954), a case involving a policy that did not define actual cash value, the New York Court of Appeals explained that the "broad evidence" rule, and not the "replacement cost less depreciation" rule, applied:

> the 'actual cash value' of premises under a standard fire insurance policy in this State cannot be arrived at by receiving evidence of replacement cost less depreciation only. Rather, the trier of fact should listen to all pertinent evidence on the subject.

*Id.,* 118 N.E.2d at 576. In *Incardona v. Home Indemnity Co.,* 60 A.D.2d 749, 400 N.Y.S.2d 944 (1977), the court held, also in the context of an insurance policy that failed to define the term "actual cash value," that

> it is error to instruct the jury that reproduction cost less depreciation is the sole measure of actual cash value.

*Id.,* 400 N.Y.S.2d at 945.

Commentators have also consistently distinguished the "broad evidence" rule from the "replacement cost less depreciation" rule. *See, e.g.,* Note, *Valuation and Measure of Recovery Under Fire Insurance Policies,* 49 Colum.L.Rev. 818, 820–824 (1949); *Insuring Real Property,* § 24.01 [4] at 24–7 to 24–9. Judicial decisions and scholarly commentaries such as these would make no sense if the term "depreciation" subsumed within it the very factors taken into account under the "broad evidence" rule.

Rather, we hold that, in the present context, depreciation is properly defined as physical deterioration. *See, e.g., Depreciation as Factor in Determining Actual Cash Value for Partial Loss under Insurance Policy,* 8 A.L.R.4th 534, 535 n. 2 (1981) ("The type of depreciation considered under insurance law is that which purports to measure the deterioration of property by reason of age and physical wear and tear"); Note, *Valuation and Measure of Recovery Under Fire Insurance Policies,* 49 Colum.L.Rev. at 823 ("Insurance law is not concerned with the estimated depreciation charged off on the

books of business establishments, but rather with the actual deterioration of a structure by reason of age and physical wear and tear, computed as of the time of loss."). Admittedly, physical deterioration is not the only possible definition of depreciation. *See Insuring Real Property*, § 24.03(3) at 24–21 ("Where the cost to repair or replace less depreciation standard is used, [a dispute exists over] whether the term depreciation implies only physical depreciation or includes a broader concept including obsolescence and economic and functional depreciation.") Nevertheless, depreciation in this case should be defined as physical deterioration pursuant to the well-established principle that ambiguities in an insurance contract must be construed in favor of the insured. *See, e.g., Anchor Toy Corp. v. American Eagle Fire Ins. Co.*, 11 A.D.2d 109, 201 N.Y.S.2d 722, 724 (1960), *aff'd*, 13 N.Y.2d 627, 240 N.Y.S.2d 609, 191 N.E.2d 94 (1963).[9]

### C.

Having determined that the Dickler Group is currently entitled to compensation only for the building's actual cash value; that actual cash value in this case means replacement cost less depreciation; and that depreciation in this case means physical deterioration, we turn to the question of the building's replacement cost and depreciation.

■■■ The District Court held that the replacement cost of the building was $7,381,490, apparently basing this figure on Harvey Stark's initial one-page report dated July 25, 1989. In that report, Stark estimated the cost of constructing 51,082 square feet at $125 per square foot and then added to that figure an "architectural and engineering fee" of 15% and the cost of obtaining a building permit.

However, subsequent to his preparation of that initial report, Stark had obtained blueprints of the Sunrise School along with other relevant information. At the direction of the Dickler Group, Stark and his assistants produced a revised report that took this new information into account. This 32–page report, dated November 2, 1990, contained a trade-by-trade breakdown and estimated the replacement cost to be $5,389,208.

At trial, Stark never mentioned his earlier $7,381,490 figure. He clearly and unequivocally testified that the $5,389,208 figure constituted his expert opinion regarding the building's replacement cost. Stark asserted that the later report contained the "true, accurate figures...." (A. 362a). Because the only expert testimony offered at trial regarding replacement cost fixed replacement cost at $5,389,208, we hold that the District Court's finding that $7,381,490 was the amount of the replacement cost was clearly erroneous and that the District Court, on the record evidence before it, had to have found replacement cost to have been $5,389,208.[10]

---

9. Judge Becker would allow the District Court to determine the meaning of "depreciation" in this contract based on the parties' intent rather than hold that "depreciation" means "physical deterioration" as a matter of law. In his view, the policy itself does not define depreciation, and he would not therefore determine its meaning on the four corners of the document. Judge Becker also notes that the District Court did not make a finding of fact regarding the term's meaning. Additionally, Judge Becker has not uncovered any cases stating that New York law construes "depreciation" to mean "physical deterioration" as a matter of law. Indeed, he notes that the majority has acknowledged that New York, in the absence of a contrary contractual provision, construes "actual cash value" under the broad evidence rule and takes into account many kinds of evidence about value and depre-

ciation. It seems to him more consistent with New York law, then, to allow for broad evidence on the subject of depreciation when no contractual provision defines the term. Therefore, Judge Becker would remand for a factfinding on the parties' intent regarding depreciation; if the District Court cannot make such a finding, he would instruct that the District Court rely on broad evidence to determine the amount that the building depreciated.

10. CIGNA's expert, Held, relied for reproduction cost on the estimate contained in the Dickler Group's report prepared by Casella, which projected replacement cost at $5,103,040, as well as on Stark's estimate of $5,389,208. Held apparently regarded Stark's estimate as the better figure. (A. 426a).

D.

The District Court made no finding of fact as to depreciation because, as discussed above, it improperly chose to award Dickler the full replacement cost rather than actual cash value. The only expert testimony at trial regarding depreciation came from Held, CIGNA's expert witness. Held's ultimate depreciation figure was clearly irrelevant because Held, utilizing the "broad evidence" rule, considered factors other than physical deterioration. Nevertheless, Held did offer at trial a rather detailed discussion of the building's "physical depreciation," which he defined as "the effects on a property of both deterioration and age." Held's "physical depreciation" category, which he considered to be only one of several components of depreciation, corresponds to the definition of depreciation that we have held in IIIB *supra* applies in this case and was thus the only evidence in the entire trial record concerning depreciation.

Accordingly, if we were restricted to Stark's determination of reproduction cost and Held's estimate of depreciation, then the actual cash value of the building was $5,389,208 (Stark's reproduction cost estimate) less $3,043,383 (Held's physical depreciation estimate, (A. 1042a, A. 430a–431a)), or $2,345,825.

 We recognize that Held also estimated what he considered to be two other components of depreciation, "economic obsolescence" and "functional obsolescence." However, neither of these components can properly be included in depreciation in this case. Held defined "economic obsolescence" as the "loss in value caused by economic or other conditions which are 'external' from the property itself." We are satisfied that, although "economic obsolescence" may play a part in determining actual cash value under the "broad evidence" rule, it should not be considered by a factfinder where, as here, the parties have precluded application of the "broad evidence" rule by defining actual cash value as replacement cost less depreciation. Further, the District Court made a finding of fact, supported by substantial evidence

in the record, that the building could have been put to alternate uses ("The Court finds that there were reasonable alternative uses to which the [building] could have been put had the loss been adjusted properly by the defendants and the [building's] fire damage repaired.") (A. 507a). This finding, which was not clearly erroneous, precluded reliance on Held's "economic obsolescence" figure.

Held also estimated the building's "functional obsolescence," which he defined as the difference between the cost of replacing the building as it was originally built (reproduction cost) and the cost of replacing the building utilizing modern techniques and materials (replacement cost). However, Stark testified at trial that he intended his $5,389,208 figure to represent replacement cost. Therefore, even if an accurate determination of replacement cost requires consideration of "functional obsolescence," Stark's replacement cost figure already reflects such a consideration.

 It may be that, on remand, the Dickler Group may stipulate to the physical depreciation figure estimated by Held, in which case there will be no need for the taking of further evidence or factfinding by the District Court. If, however, the Dickler Group, having been precluded from adducing evidence of physical depreciation, (A. 324a–325a), would now seek to introduce such evidence, then the District Court should hear the parties on the narrow issue of what amount of depreciation (defined as physical deterioration or physical depreciation) should be subtracted from Stark's $5,389,208 replacement cost estimate so as to arrive at a figure for actual cash value. In that situation, both parties, of course, should be permitted to produce evidence of depreciation, as herein defined, to assist the District Court in making its finding of fact.

E.

The District Court awarded the Dickler Group $185,000 for demolition costs. However, the evidence indicates, and the Dickler Group conceded in its brief and at oral

argument, that actual demolition costs totalled only $180,000, constituting a $185,000 demolition fee less a $5,000 rebate for early payment. (A. 159a). Therefore, in addition to receiving compensation for the building's actual cash value, the Dickler Group should receive $180,000 from CIGNA for demolition costs.

### F.

The insurance contract required CIGNA to pay Dickler within 30 days after an agreement had been reached as to the building's actual cash value. Because the parties' failure to agree was improperly caused by CIGNA, we hold that interest should accrue from November 23, 1988, 30 days after CIGNA's adjuster received an estimate from the Dickler Group,[11] on the award of whatever is deemed to be the actual cash value. *See Schmitt Bros. v. Boston Ins. Co.*, 82 A.D. 234, 81 N.Y.S. 767, 770–71 (1903). *See also Buttignol Construction Co. v. Allstate Insurance Co.*, 22 A.D.2d 689, 253 N.Y.S.2d 172, 173 (1964) ("In our opinion, interest should be computed from the date defendant may be deemed to have breached its contract of insurance"). Interest should accrue on the $180,000 demolition cost award from April 7, 1989, the date on which the Dickler Group was granted a permit to demolish the building.

### III.

We will therefore affirm the District Court's January 28, 1991 order which rejected the Dickler Group's claim for punitive damages. At the same time, we will vacate the District Court's order of April 1, 1991 which awarded a judgment of $7,381,490 to the Dickler Group and we will remand this case to the District Court with the following instructions:

If the Dickler Group stipulates that depreciation of $3,043,383 (as testified to by Held) is the amount of depreciation to be subtracted from the replacement cost of $5,389,208 (as testified to by Stark), then, and in that event, no further evidence need be taken nor findings made, and a judgment in the amount of $2,345,825 (actual cash value at the time of the fire) plus $180,000 (demolition costs) should be entered by the District Court in favor of the Dickler Group together with interest as set forth in this opinion.

In the event that the Dickler Group does not stipulate to the amount of physical depreciation as testified to by Stark, but chooses instead to introduce evidence as to the amount of physical depreciation, then, and in that event, the District Court shall accept relevant evidence from both the Dickler Group and CIGNA as to the physical depreciation of the building at the date of loss and shall make a finding as to the amount of such depreciation. That amount shall be subtracted from the replacement cost of $5,389,208, and the District Court shall then add $180,000 to that figure for demolition cost and shall enter a judgment in the resulting amount.

Consistent with the foregoing opinion, the District Court shall add to its judgment in favor of the Dickler Group interest on the actual cash value found (by subtracting depreciation from replacement cost) from November 23, 1988 and interest on the $180,000, representing demolition cost, from April 7, 1989. Interest shall be computed at the relevant rate or rates.

The District Court's order shall also provide, consistent with the foregoing opinion, that the Dickler Group shall have 365 days to rebuild, calculated from the date it receives satisfaction on the foregoing judgment and, upon such reconstruction, CIGNA shall be obligated to pay the difference between the amount of the judgment provided herein and the total replacement cost

11. CIGNA's adjuster received the Dickler Group's estimate on October 24, 1988. November 23, 1988 provides for the 30-day period specified in the policy.

If the Dickler Group agrees that Held's estimate of $3,043,383 for physical depreciation is the figure that should be subtracted from the $5,389,208 replacement cost, then interest would accrue on $2,345,825 from November 23, 1988.

of the rebuilt structure, pursuant to CIGNA's policy of insurance.

Each party shall bear its own costs.