Peter S. **LINDER**

v.

**INHALATION THERAPY SERVICES, INC., Appellant.**

No. 87–1165.

United States Court of Appeals, Third Circuit.

Argued Sept. 28, 1987.
Decided Nov. 19, 1987.

Thomas B. Kenworthy (argued), Frank A. Labor III, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellant.

Leonard Dubin (argued), Richard L. Kremnick, George J. Krueger, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellee.

Before SEITZ, GREENBERG, and ROSENN, Circuit Judges.

### OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal requires us to interpret a written sales representation agreement between the plaintiff-appellee, Peter S. Linder, and Respiratory Care Services (RCS). RCS subsequently merged with Inhalation Therapy Services, Inc. (ITS), the defendant-appellant in this litigation. After a trial in the United States District Court for the Eastern District of Pennsylvania, a jury awarded plaintiff commissions of $104,224.40. The defendant appeals, contending that the district court erred in failing to direct a verdict in its favor. We reverse.

### I.

In December 1983, Linder and Roy Hathcock, president of RCS, engaged in a series of negotiations that culminated in the execution of a sales representation agreement granting Linder the exclusive right to solicit respiratory service contracts on behalf of RCS in the Northeastern United States.[1] The agreement entitled Linder to a commission of either five or eight percent of the gross revenues of contracts he obtained on behalf of RCS. In the event a contract obtained by Linder was renewed, the agreement entitled him to a commission of 2.5% of the renewal revenues. The agreement further provided that upon execution of a contract, plaintiff was to be paid fifty percent of the total commission due on

---

1. RCS, a respiratory services corporation, provided equipment, personnel, and management to participating hospitals on a contract basis.

revenues received over the first year of the contract term. The balance of a commission was to be paid on a monthly basis over the remaining contract term.

During the course of the negotiations, Hathcock disclosed his intention to sell RCS. Noting the possible effect of a subsequent sale, the parties agreed to a provision that entitled Linder to commissions on contracts whose terms might extend beyond the duration of the agreement. In essence, section 5.7 of the contract ensured that a purchaser of RCS could not deprive Linder of a commission's unpaid balance simply by terminating the agreement. Linder additionally disclosed the existence of Hospital Purchasing Services (HPS), a group purchasing organization consisting of one hundred ten hospitals throughout Pennsylvania. He observed that the establishment of a business relationship with HPS would inevitably lead to individual contracts with its constituents. The impact of RCS' sale on nascent HPS contracts induced the parties to execute a provision entitling Linder to commissions on contracts obtained by RCS after the term of the principal agreement. The parties envisioned that plaintiff's initial contacts with HPS possibly would result in RCS' procurement of contracts after the agreement was terminated by a subsequent purchaser. Section 5.8 therefore guaranteed Linder's right to post-termination commissions resulting from his sales activities. Shortly thereafter, the parties expanded the agreement to encompass MAGNET, an association of group purchasing organizations representing some five hundred and fifty hospitals. The language and intention of section 5.8 was embodied in section 5.9 of the amendatory agreement, which entitled Linder to a commission on "any contract obtained by RCS after the term of this Agreement from ... any hospital or organization participating in MAGNET."[2]

From January to April 1984, Linder performed in accordance with the agreement but obtained no contracts on behalf of RCS. In April 1984, Hathcock informed the plaintiff that RCS had been sold to its one time competitor, ITS. At Hathcock's insistence, Linder went to Lexington, Massachusetts to meet with ITS chief operating officer, Reid Baddeley, and its vice president for sales and marketing, Jack Donahue. During the course of three meetings over a two day period, Linder reviewed the details of the RCS agreement, especially as it pertained to MAGNET. After commenting that ITS was "weak in the northeast," Donahue instructed Linder to continue his solicitation of MAGNET participants, this time on behalf of ITS. For the next twelve months, Linder contacted a number of the seven group purchasing organizations that comprised MAGNET, but failed to obtain a contract on behalf of ITS.[3] During that period, Linder continually apprised Donahue of his progress and requested an accounting documenting any new or pre-existing ITS contracts with MAGNET affiliates. Donahue failed to respond to Linder's requests, and on April 16, 1985, Baddeley terminated the agreement pursuant to paragraph ten of the contract.

Linder instituted suit to recover commissions on eleven contracts obtained by ITS with MAGNET hospitals between December 1983, and May 1985. On Linder's motion for summary judgment prior to trial, the district court held that ITS had assumed the RCS agreement with Linder as a matter of law. At the conclusion of trial, ITS moved for a directed verdict, contending that section 5.9 prohibited consideration of the ten contracts obtained by ITS before the agreement's termination, and that Linder had introduced no evidence establishing that his activities resulted in the procurement of the single contract obtained after his dismissal. The district court denied the motion and submitted evidence of all eleven contracts to the jury.

**2.** Because HPS was one of seven group purchasing organizations that comprised MAGNET, the amendatory agreement effectively superceded section 5.8.

**3.** Among the groups that Linder contacted were the Joint Purchasing Organization of New York, the Hospital Purchasing Service of Pennsylvania, Hospital Services of New England, and the Central Hospital of Pennsylvania.

## II.

### A.

Initially, we are required to ascertain whether Pennsylvania law applies to this diversity action. The defendant contends that because both the principal and amendatory agreements were negotiated in Jackson, Mississippi, the law of Mississippi determines the validity of the contract.[4] Assuming Mississippi law applies, ITS argues that the amendatory agreement must fail for lack of consideration. *See Krebs v. Strange,* 419 So.2d 178 (Miss.1982).

A federal court sitting in a diversity action applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elevator Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Pennsylvania law directs us to consider the extent "to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law." *Myers v. Commercial Union Assurance Companies,* 506 Pa. 492, 496, 485 A.2d 1113, 1116 (1984), quoting *McSwain v. McSwain,* 420 Pa. 86, 94, 215 A.2d 677, 682 (1966). Amplifying its adherence to interest analysis, the Pennsylvania Supreme Court added that in evaluating the interest of one jurisdiction over another, "we must view the factors qualitatively as opposed to quantitatively." *Id.* 485 A.2d at 1116.

■ Assuming that the agreement was both negotiated and executed in Mississippi, we nonetheless hold that Pennsylvania has the most significant interest in the outcome of this action. Pennsylvania is both the residence of the plaintiff, and the forum for a significant portion of his solicitation activity. On the other hand, Mississippi has no discernible interest in a contract dispute between a Pennsylvania resident and a Delaware corporation. The parties neither relied upon Mississippi law in drafting their agreement, nor selected it to resolve disputes arising out of the contract. Mississippi's contacts, even if rich in quantity, are poor in quality.

■ Applying Pennsylvania law, we conclude that the amendatory agreement is supported by adequate consideration. The Uniform Written Obligations Act provides, in relevant part:

> A written release or promise, hereafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound.

33 P.S. § 6. In extracting RCS' promise to pay commissions in exchange for Linder's promise to solicit MAGNET participants, the amendatory agreement expressed a clear intention to bind both parties.

■ The defendant next contends that the district court erred in holding that ITS assumed the agreement as a matter of law.[5] We disagree. Under Delaware cor-

---

4. Defendant additionally argues that the agreement was executed in Mississippi; however, the record fails to clearly disclose the state of execution.

5. Although it initially held that ITS had assumed the agreement as a matter of law, the district court subsequently presented the issue to the jury as a question of fact. The jury was instructed that while ITS had assumed RCS' *outstanding* obligations under the agreement, the question of whether ITS intended to assume any *new* obligations was an issue of fact. Seizing upon this dichotomy, the defendant argues that the merger did not have the effect of "rewriting the agreement" by making ITS an actual party to the contract. Both ITS and the district court seek to bifurcate what is in actuality a single inquiry. ITS attempts to limit the legal effect of an assumption to only those liabilities outstanding at the date of merger; post-merger liability under the contract, it asserts, is contingent upon a corporation's willingness to perpetuate the pre-existing contract. ITS argues that while pre-merger liability accrues by operation of law, post-merger liability under the contract is a question of fact. ITS' contention effectively turns the legal effect of assumption on its head. Assumption implies financial responsibility for the life of an existing contract; if a surviving corporation could extinguish the continuing liabilities of a constituent corporation under the contract simply by effectuating a merger, then the survivor "assumes" nothing at all. If ITS wished to insulate itself from Linder's claim, it should have explicitly excluded the agreement from the terms of the merger. In any event, the

poration law,[6] "all debts, liabilities, and duties of the constituted corporations ... attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities, and duties had been incurred or contracted by it." 8 Del.Code Ann. § 259. Because ITS failed to exclude the contract from the merger agreement, it is held to have assumed it.[7] Moreover, the record contains overwhelming evidence of ITS' intention to assume the agreement. After Donahue was informed of Linder's obligations under the agreement, he instructed Linder to continue his solicitation of MAGNET affiliates. From April 1984 to April 1985, Linder solicited contracts on ITS' behalf and reported directly to Donahue. Finally, ITS, exercising the right of a party, terminated the agreement pursuant to section ten thereof.[8]

### B.

■ We come finally to the crux of the present case, whether the agreement entitles the plaintiff to sales commissions on eleven contracts obtained by ITS. Our determination of whether the district court erred in failing to direct a verdict is circumscribed by two distinct standards of review. Inquiry into the legal operation of a contract is a question of law and is therefore subject to plenary review. *Cooper Labs v. International Surplus Lines*, 802 F.2d 667, 671 (3d Cir.1986). Once we have established the legal effect of the agreement, we must examine the record in a light most favorable to the plaintiff, the holder of the verdict, and determine whether the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief. *Link v. Mer-*

*cedes–Benz of North America, Inc.*, 788 F.2d 918, 921 (3d Cir.1986).

■ A contract must be interpreted in accordance with the meaning ascribed to it by the parties. *Capitol Bus Company v. Blue Bird Coach Lines*, 478 F.2d 556, 560 (3d Cir.1973). Intention is determined from the entire agreement; extrinsic evidence is considered only if the language is ambiguous. *See Landtect Corp. v. State Mutual Life Assurance Co. of America*, 605 F.2d 75, 79 (3d Cir.1979).

Section 5.0 of the agreement between the parties embodies the terms and conditions of Linder's entitlement to a commission:

> As compensation for soliciting contracts on behalf of RCS, RCS agrees to pay Sales Representative [Linder] a commission equal to five percent (5%) of the gross revenues received by RCS during the primary term of any full service or shared service contract and eight percent (8%) of the gross revenues received by RCS during the primary term of any management service contract which Sales Representative [Linder] obtains on behalf of RCS.... During any renewal term of any contract obtained on behalf of RCS by Sales Representative, RCS agrees to pay Sales Representative [Linder] a commission equal to two and one-half percent (2½%) of the gross revenues received from such contract by RCS during such renewal period.

Similarly, section 5.7 entitled Linder to any unpaid commissions on contracts whose terms continued after the life of the agreement.[9] Finally, section 5.9 of the amendatory agreement provides as follows:

---

effect of assumption is a question of law and the district court erred in submitting it to the jury.

**6.** The parties concede that Delaware law, the state of ITS' incorporation, governs the merger.

**7.** ITS relies upon an affidavit by Baddeley asserting that the defendant did not assume the agreement upon completion of the merger. The district court correctly concluded that the affidavit was conclusory and should therefore be accorded no weight. *See Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir.1985).

**8.** The defendant observes that its formal merger with RCS did not occur until August 1985, four months *after* it terminated the agreement. Therefore, it argues, it could not have assumed obligations that were non-existent at the time of the merger. The argument is without merit. ITS purchased RCS from Hathcock in April 1984. From that moment, RCS had no independent corporate existence. ITS cannot avoid the legal effect of what amounts to a de facto merger simply by arguing that the merger was not finalized until August 1985.

**9.** Section 5.7 provides:

Sales representative shall also be entitled to any commissions due of any contract obtained by RCS after the term of this agreement from MAGNET, Trenton, New Jersey, a shared services organization or for any hospital or organization participating in MAGNET. Such commissions shall be paid in the same manner subject to the same conditions as other commissions hereunder.

Initially, we observe that section 5.0 was intended to inform the entire agreement. Section 5.9 explicitly subjects MAGNET commissions to the terms and conditions outlined in section 5.0. However, an attempt to read the two paragraphs together presents a patent inconsistency. While section 5.0 entitles Linder to commissions for contracts that *he obtains* on behalf of RCS, section 5.9 compensates him for contracts that *RCS obtains.* The agreement utterly fails to describe Linder's responsibilities under each of the respective provisions. For example, we cannot determine what Linder must do to "obtain" a contract under section 5.0, nor what he must do to earn a commission when RCS obtains a contract under section 5.9. Thus, we are compelled to construe the contract in light of the extrinsic evidence that surrounded its execution.

It is not surprising that the provisions cannot be read together since they refer to two distinct kinds of sales activity. Section 5.0 contemplated Linder's personal solicitation of individual hospitals. Linder testified that to obtain a contact under section 5.0 he had to [10]

> [M]eet with hospitals. I would have to follow that through somehow, probably, delivering pertinent documents back to RCS, and then somewhere along the line RCS would enter into a contract or an

agreement with those hospitals for service.

Hathcock similarly testified that to obtain a commission, "some of what he had been working on ... [had to] result in us getting a contract." We conclude that section 5.0 imposes a strict nexus between Linder's activities and the procurement of a sales contract. In other words, to obtain a contract Linder was required to personally solicit hospitals and participate in the preparation of a proposal that was accepted both by the hospital and by RCS. In contrast, section 5.9 anticipated that Linder would solicit only the group purchasing organizations that comprised MAGNET. Unlike section 5.0, section 5.9 contemplated little interaction with the constituent hospitals; instead, Linder directed his activities to a higher level of management, which, in turn, would result in the procurement of individual hospital contracts. Describing Linder's responsibilities with respect to section 5.9, Hathcock testified:

> Just a contact with these agencies did not get us a contract. It was a local hospital decision. He had to visit them. He had to gather information. He had to generate a proposal. Once a proposal was agreed on by both parties, it's signed, bing, he's entitled to....

■ We must reject this construction of Linder's responsibilities because it fails to accord any independent significance to section 5.9. By visiting local hospitals and generating a proposal, Linder undoubtedly has "obtained" a contract *himself,* and therefore would be entitled to a commission pursuant to section 5.0. ITS thus betrays the express language of section 5.9 which requires a contract obtained *by RCS,* not by Linder. Additionally, in equating section 5.0 with section 5.9, ITS completely overlooks the distinction between the local

Sales representative shall be entitled to any commissions due of any contract obtained by him for RCS which continues after the term of this Agreement. Such commissions shall be paid monthly in the same manner and subject to the same conditions as other commissions due hereunder.

10. We observe that a substantial portion of the testimony contrasting Linder's responsibilities under sections 5.0 and 5.9 referred to section

5.7. The distinction between 5.7 and 5.0 is unimportant because both sections require Linder to obtain a contract on behalf of RCS in order to be entitled to a commission. The only difference between the sections is that section 5.7 protects Linder in the event he obtains a hospital contract and his sales representative agreement is terminated before he is paid in full.

**312**

hospital and the group purchasing organization. Section 5.9 cannot contemplate Linder's solicitation of MAGNET groups and yet simultaneously require him to solicit local hospitals. Instead, we believe that the plaintiff's interpretation of section 5.9 properly accords independent significance to both provisions by effectively differentiating the group purchasing organization from the local hospital. Linder testified:

> My responsibilities really were to work with the large purchasing groups to establish RCS' presence among those groups ... and then that information would trickle down to the hospitals and we would get a lot of contracts many years into the future.

We accept Linder's "trickle down" theory of section 5.9 with one important qualification. Although the nexus between sales activity and actual procurement need not be as strict as in section 5.0, we believe that Linder must demonstrate *some* level of causation between his solicitation of a group purchasing organization and ITS' ultimate procurement of an individual hospital contract.[11] For example, Linder must demonstrate that information communicated to a group purchasing agent was then communicated to a local hospital which, as a result, entered into a contract with ITS. In this scenario, ITS obtains the contract, but Linder is the indirect source of procurement. We recognize that this standard imposes a degree of hardship on the plaintiff, especially because a significant amount of time might pass between his initial solicitation of a group purchasing agent and ITS' ultimate procurement of a contract. However, the parties could not have intended the plaintiff to collect commissions in perpetuity on all ITS contracts obtained with MAGNET hospitals merely by virtue of his initial solicitations. In that instance, Linder could recover commissions in perpetuity regardless of whether he could demonstrate that the contract resulted from activities undertaken during the course of his twelve-month employment.

**C.**

■ Applying the preceding discussion to the facts of the present inquiry, we note that of the eleven contracts on which Linder claims a commission, only one, Children's Seashore, was obtained after the term of the agreement. Although Linder testified that he contacted and met with group purchasing organizations during the term of the agreement, he introduced no evidence that any of his solicitations directly or indirectly resulted in ITS' procurement of the Children's Seashore contract. Thus, the district court erred in submitting evidence of this contract to the jury.

■ Ten of the contracts obtained by ITS were obtained by it *prior* to the termination of the agreement. Section 5.9 unambiguously entitles the plaintiff to commissions on contracts obtained by ITS *after* the term of the agreement. Therefore, the district court erred in submitting evidence of the ten pre-termination contracts to the jury. Concededly, the agreement permits a rather anomalous result. If Linder's solicitation of a MAGNET group purchasing organization resulted in ITS' procurement of a hospital contract *during* the course of the agreement, section 5.9 would preclude his entitlement to a commission. The language of section 5.9 might be explained in part by the parties' reliance on the effect of RCS' impending sale. Apparently, neither Linder nor Hathcock believed that a MAGNET contract would be consummated before the purchase of RCS and the subsequent termination of the agreement. Neither party seems to have contemplated that a purchaser might decide to perpetuate the agreement.

Linder nonetheless maintains that he is entitled to a commission on the University of Maryland contract, either by virtue of section 5.9 or by the renewal provisions of section 5.0. We disagree. As one of the ten contracts obtained by ITS during the term of the agreement, the Maryland Hospital contract is precluded by section 5.9. Additionally, we conclude that in order to be entitled to a renewal commission under

**11.** We note that as a result of the assumption of the RCS agreement, ITS is obligated to pay Linder commissions on contracts it obtains pursuant to section 5.9.

section 5.0, Linder must have obtained the initial contract. Section 5.0 asserts that "during any renewal term of any contract *obtained by sales representative* ... RCS agrees to [pay] a sales commission of *2.5%.*" Since *ITS* obtained the underlying contract with Maryland Hospital, Linder is not entitled to a renewal commission on it pursuant to section 5.0. Thus, because no evidence existed to support Linder's entitlement to the Children's Seashore contract, and section 5.9 precluded jury consideration of the ten pre-termination contracts as a matter of law, the district court therefore erred in failing to direct a verdict in ITS' favor.

The judgment of the district court will be reversed and the case remanded with directions to enter judgment in favor of Inhalation Therapy Services, Inc. Each side to bear its own costs.