

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-10-2004

# IPSCO Steel v. Blaine Constr Corp

Precedential or Non-Precedential: Precedential

Docket No. 03-2929

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"IPSCO Steel v. Blaine Constr Corp" (2004). *2004 Decisions.* Paper 559.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/559

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT
_____

No. 03-2929
_____

IPSCO STEEL (ALABAMA), INC., an
Alabama Corporation; IPSCO
CONSTRUCTION, INC., an Alabama
Corporation; KVAERNER U.S. INC., a
Delaware Corporation

v.

BLAINE CONSTRUCTION
CORPORATION, a Tennessee
Corporation.

Kvaerner U.S. Inc., Appellant

(D.C. Civil Action No. 99-cv-02055)

_____

No. 03-2966
_____

BLAINE CONSTRUCTION
CORPORATION, a Tennessee
Corporation

v.

IPSCO CONSTRUCTION, INC., an
Alabama Corporation; KVAERNER
U.S. INC., a Delaware Corporation;
LIBERTY MUTUAL INSURANCE

COMPANY, a Massachusetts
Corporation; MARSH USA, INC., a
Delaware Corporation f/k/a J&H
MARSH & MCLENNAN, INC.;
LIBERTY INTERNATIONAL
CANADA, a division of LIBERTY
MUTUAL INSURANCE COMPANY, a
Massachusetts Corporation.

Kvaerner U.S. Inc., Appellant

(D.C. Civil Action No. 01-cv-00440)

_____

On Appeal from the
United States District Court for the
Western District of Pennsylvania
District Judge: Hon. Arthur J. Schwab

_____

Argued on Tuesday, April 20, 2004

_____

Before:      SCIRICA, GARTH, and
BRIGHT,* Circuit Judges

(Opinion Filed: June 10, 2004)

_____

*Honorable Myron H. Bright,
United States Court of Appeals for the
Eighth Circuit, sitting by designation.

1

Doty, Robert W.
Ejzak, Richard A. (argued)
Roman, Andrew M.
Cohen & Grigsby, P.C.
11 Stanwix Street, 15th Floor
Pittsburgh, PA  15222

Rogers, E. Mabry
Bradley, Arant, Rose & White, LLP
1819 Fifth Avenue North
Birmingham, AL  35203

*Attorneys for Appellant Kvaerner U.S. Inc.*

Dingess, John R.
Lund, Kenneth J.
Saulnier, Brian F.
Kirkpatrick & Lockhart LLP
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA  15222

Lucas, Kevin P.
Williams, Robert J.
Manion, McDonough & Lucas P.C.
600 Grant Street
Suite 1414
Pittsburgh, PA  15219

Harper, Steven J. (argued)
Kirkland & Ellis LLP
200 East Randolph Drive
Suite 6500
Chicago, IL  60601

Landau, Christopher
Kirkland & Ellis LLP
655 15th Street, N.W.
Suite 1200

Washington, DC  20005

*Attorneys for Appellees IPSCO Steel (Alabama) Inc. and IPSCO Construction Inc.*

Medved, George M.
Pepper Hamilton LLP
500 Grant Street
5000 One Mellon Bank Center
Pittsburgh, PA  15219

Little, J. Ford
Noell, Robert P.
Walton, Monty L.
Woolf, McClane, Bright, Allen & Carpenter, PLLC
900 South Gay Street
Suite 900, Riverview Tower
Knoxville, TN  37902

*Attorneys for Appellee Blaine Construction Corporation*

Long, Kevin M.
Van Vugt, Eric J.
Quarles & Brady LLP
411 East Wisconsin Avenue, #2500
Milwaukee, WI  53202

*Attorney for Appellee Marsh USA, Inc.*

Reed, Jonathan S.
Smith, Sean K.
Traub, Richard K.
Traub, Eglin, Lieberman & Straus
100 Metroplex Drive
Metroplex Corporate Center I, Suite 203
Edison, NJ  08817

2

Sherman, C. Leon
C. Leon Sherman & Associates
20 Stanwix Street
5th Floor
Pittsburgh, PA 15222

*Attorneys for Appellee Liberty Mutual
Insurance Company*

_____

OPINION

_____

Garth, Circuit Judge:

The question which we must answer on this appeal is whether the District Court properly approved two settlement agreements among the litigants over the objection of one of the parties, Kvaerner U.S. Inc. ("Kvaerner"). Because we hold that the District Court did not err, we affirm.

## I.

### A. Kvaerner

This litigation arose from a $550 million project involving the construction of a steel plant in Alabama. The project owner, IPSCO Steel, Inc. ("IPSCO") hired Kvaerner as its Project Manager. Under the Project Management Agreement ("PMA"), Kvaerner was responsible for recommending the contracts that IPSCO awarded to various subcontractors and suppliers. The PMA also specified that Kvaerner was "IPSCO's agent for the purpose of administering Supplier Contracts and managing and coordinating Suppliers' Work" and that, in connection with liens and disputes, Kvaerner was "to protect IPSCO's interests at all times."

The PMA prescribed certain penalties and incentives. Kvaerner expressly warranted that the "Aggregate Cost" of the project would not exceed a "Guaranteed Maximum Price" of $182 million and that it would reimburse IPSCO for any costs in excess of $182 million. If, however, the Aggregate Cost came in below the Guaranteed Maximum Price, IPSCO promised to share 50% of the savings with Kvaerner.

The PMA anticipated that certain disputes would arise with the suppliers and it authorized Kvaerner to serve as IPSCO's litigation manager. The relevant provision, which is Section 4.04(x) in the PMA, reads:

> The Project Manager [Kvaerner] shall be primarily responsible for the management and resolution, either with its own resources or through legal counsel or other consultants, of claims and disputes between Suppliers and with Suppliers within the Guaranteed Portion of the Project . . . provided

3

that [Kvaerner] shall promptly inform and keep IPSCO fully informed of such claims and disputes and any negotiations or legal proceedings with such Suppliers . . . [and] that any final resolution or settlement of such dispute shall be subject to IPSCO's approval . . . *[and] IPSCO's interests are otherwise at all times protected . . . .*

(Appendix at 220.)

The PMA also included an insurance component. Specifically, the PMA required IPSCO to procure at least $20 million of professional liability insurance covering Kvaerner, the sub-consultants, and the design professionals. To satisfy this obligation, IPSCO hired Marsh USA, Inc. ("Marsh"), an insurance broker, who in turn procured a $20 million policy from Liberty Mutual Insurance Company ("Liberty Mutual"). The policy was a so-called "wasting policy," whereby costs of defending legal actions would be deducted from the total amount of available coverage.

## B. Blaine

On Kvaerner's recommendation, IPSCO awarded the contract to complete the design and construction of the primary buildings to Blaine Construction Corporation ("Blaine"). Less than one year into the project, Blaine discovered design errors in its work and abandoned the project, which caused significant disruptions and delays.

In response to Blaine's unexpected abandonment, IPSCO and Kvaerner entered into a written agreement reinforcing their (IPSCO's and Kvaerner's) agency relationship and amending certain aspects of the PMA. The "Amending Agreement," which estimated the losses resulting from Blaine's abandonment to be in the range of $14 million to $18 million, provided that any proceeds ultimately recovered from Blaine or its insurers, if any, would be paid solely to IPSCO, but that such recovered funds would be applied as a credit against the "Aggregate Cost" under the PMA.

Under the terms of the Amending Agreement, IPSCO and Kvaerner agreed Kvaerner would pursue recovery from Blaine, Liberty Mutual and Marsh for damages resulting from Blaine's conduct. More important, IPSCO and Kvaerner agreed their respective roles in that dispute would be governed by Section 4.04(x) of the PMA. *See* Amending Agreement ¶ 5.01 ("The rights and responsibilities of [Kvaerner] and IPSCO in respect of the Blaine Action will be governed by section 4.04(x) [of the PMA].") (App. 278.).

## C. Construction Action; Coverage Action

4

At about the same time, IPSCO and Kvaerner filed suit against Blaine in the District Court for the Western District of Pennsylvania, where Kvaerner has its principal place of business. The complaint sought to recover the damages caused by Blaine's abandonment and design errors. For ease of reference, we will refer to this lawsuit as the "Construction Action."

Blaine then turned to Liberty Mutual and demanded both defense and coverage under the $20 million wasting policy that Liberty Mutual had issued. When Liberty Mutual denied coverage on the ground that it had allegedly never received proper notice that Blaine was an insured under the policy, Blaine filed suit against Liberty Mutual in the Western District of Pennsylvania seeking a declaration from the court that it was covered under the policy. Blaine also asserted claims against Marsh, the insurance broker, because Marsh had issued an "advice of insurance" three years earlier assuring Blaine that it was covered by the Liberty Mutual policy. We refer to this lawsuit as the "Coverage Action."

The following year, IPSCO and Kvaerner entered into a confidential settlement agreement with Blaine (the "Construction Action Settlement"). Under that agreement, the parties agreed to submit the issue of Blaine's liability to an arbitration panel and, in the event the arbitration panel found Blaine liable, the parties agreed to enter a $26 million stipulated judgment against Blaine in favor of IPSCO. Blaine, however, had "empty pockets," so IPSCO and Kvaerner further agreed that they would satisfy the $26 million judgment, if any, by looking solely to Blaine's insurers.

To that end, the Construction Action Settlement required Blaine to continue prosecuting the Coverage Action against Liberty Mutual and against Marsh. Blaine was prohibited from settling any of its claims without prior written approval from IPSCO and Kvaerner. Upon learning of the Construction Action Settlement, the District Court stayed both the Construction Action and Coverage Action, presumably because a finding of "no liability" in the arbitration proceeding would put an end to both lawsuits.

D. Alabama Action Against Kvaerner

Meanwhile, IPSCO filed a lawsuit against Kvaerner in federal court in Alabama seeking more than $60 million in various cost overruns on the project. These cost overruns included damages resulting from Blaine's abandonment of construction. Because Kvaerner is insured under the $20 million policy issued by Liberty Mutual, almost all of the defense costs that it incurred in the Alabama lawsuit have been paid by Liberty Mutual. Accordingly, each dollar spent on Kvaerner's defense reduced Liberty Mutual's coverage under its wasting policy. It was

5

estimated at oral argument that $5 million had been expended to that time.

### E. Liberty Mutual Settlement

While the arbitration proceeding was pending, IPSCO, Blaine, and Liberty Mutual commenced settlement discussions. Apparently, Kvaerner was invited to participate in these discussions, but declined to do so. In May 2003, IPSCO, Blaine, and Liberty Mutual reached a settlement that resolved all of the outstanding claims in the Construction and Coverage Actions except those claims involving Marsh (the "Liberty Mutual Settlement"). Under the Liberty Mutual Settlement, (i) IPSCO and Kvaerner agreed to release all claims that they had asserted in the Construction Action against Blaine, and (ii) Blaine agreed to release all claims that it had asserted in the Coverage Action against Liberty, IPSCO and Kvaerner. In return, Liberty Mutual agreed to pay $6 million to IPSCO.

Immediately after the Liberty Mutual Settlement was reached, IPSCO mailed a letter to Kvaerner which read:

> As you know, pursuant to Section 4.04(x) of the PMA, Kvaerner has been acting as agent and litigation manager for IPSCO in the Pennsylvania legal proceedings against Blaine and related insurance coverage

litigation against Liberty and Marsh U.S.A., Inc. ("Marsh").

> Blaine, IPSCO, and Liberty have now concluded a settlement agreement to resolve the Pennsylvania proceedings as to all parties except Marsh. A copy of the Settlement Agreement is enclosed.

> Pursuant to the PMA, IPSCO hereby directs Kvaerner, as its agent, to confirm in the space provided below that Kvaerner consents to the enclosed Settlement Agreement insofar as any such consent might be required from Kvaerner. Please return a countersigned copy of this letter.

(App. at 334.)

Kvaerner refused to consent to the Liberty Mutual Settlement because it felt that the $6 million settlement was insufficient in light of the negotiated judgment of $26 million. When Kvaerner made it known that it would not consent to the Liberty Mutual Settlement of $6 million, IPSCO filed a motion in the District Court asking the District Court Judge to: (i) reopen the

6

Construction and Coverage Actions; (ii) approve the Liberty Mutual Settlement of $6 million; and (iii) dismiss all of the claims in the Construction and Coverage Actions except those involving Marsh. Kvaerner opposed the motions, arguing that IPSCO had no right to force it to accept a settlement agreement to which it did not agree.[1]

## F. Marsh Settlement

Shortly before the District Court was scheduled to hear oral argument on IPSCO's motions, IPSCO reached a settlement with Marsh on the remaining claims (the "Marsh Settlement"). In exchange for a release of all claims in the Coverage Action, Marsh agreed to pay IPSCO $500,000. Two days before oral argument, IPSCO filed a motion to approve the Marsh Settlement in the District Court.

## G. District Court Ruling

Following oral argument, the District Court granted both of IPSCO's

---

[1] Lexington Insurance Company ("Lexington"), which had issued a professional liability policy to Kvaerner, also opposed the proposed settlement, although it was not a party to either action. Lexington has filed a separate appeal, which we also decide today. *See IPSCO Steel (Alabama) Inc. v. Blaine Constr. Corp.,* at Docket Nos. 03-3109/3110, -- F.3d -- (3d Cir. 2004).

motions in their entirety, thereby approving the Liberty Mutual and Marsh Settlement Agreements and dismissing both actions. The District Court concluded that Kvaerner could not unilaterally veto or affect the Settlement Agreements because, under the PMA, it was required to *"protect IPSCO's interests"* in any litigation with project suppliers. The District Court held that: (i) Kvaerner had a fiduciary duty as IPSCO's agent to act for IPSCO's benefit; (ii) IPSCO had the right to control the resolution of disputes and litigation; and (iii) Kvaerner was contractually obligated to follow any instructions by IPSCO. In short, the District Court found that the agency relationship prohibited Kvaerner from placing its own financial interests ahead of IPSCO's interests. The District Court therefore approved the Liberty Mutual and Marsh Settlements and dismissed the Construction and Coverage Actions.

Kvaerner thereafter filed these appeals. We have jurisdiction to hear the appeals pursuant to 28 U.S.C. § 1291. The District Court's factual findings will not be reversed unless the record demonstrates that they are clearly erroneous. *See* Fed. R. Civ. P. 52(a). Conclusions drawn with respect to the legal effect of any agreement are, however, questions of law and therefore subject to plenary review. *See Linder v. Inhalation Therapy Servs., Inc.,* 834 F.2d 306, 310 (3d Cir. 1987).

## II.

The crux of the issues on appeal is whether the District Court erred when it approved the two Settlement Agreements, notwithstanding Kvaerner's objection. The answer turns primarily on the question of whether Kvaerner was IPSCO's agent for purposes of the lawsuits and whether Kvaerner contracted to protect IPSCO's interests.

Under Alabama law, "[a]gency is generally a question of fact to be determined by the trier of fact."[2] *Thrash v. Credit Acceptance Corp.,* 821 So. 2d 968, 972 (Ala. 2001). The existence of a principal-agent relationship normally turns on whether the alleged principal reserved a right of control over the manner of the alleged agent's performance. *Id.* "The right-of-control test requires that the right be reserved, not that the right be actually exercised." *Id.* "How the parties characterize the relationship is of no consequence; it is the facts of the relationship that control." *Id.*

The District Court found that Kvaerner was contractually obligated to act as IPSCO's agent and litigation manager for purposes of disputes arising between IPSCO and IPSCO's suppliers and subcontractors on the project.

The District Court's finding is supported by the PMA. The PMA gives Kvaerner "primary responsibility" for disputes between IPSCO and its Suppliers, but requires Kvaerner to protect IPSCO's interests "at all times" and reserves final settlement approval to IPSCO.[3] Thus, IPSCO assigned certain authority to Kvaerner, but it retained the right to control the manner in which Kvaerner managed disputes and it [IPSCO] retained the right to control settlements of disputes.

Kvaerner contends that it is not the agent of IPSCO for purposes of the contested settlements. First, Kvaerner argues that, "[t]he fact that IPSCO (and Blaine and Liberty Mutual) conditioned the effectiveness of the [Liberty Mutual Settlement] on Kvaerner's consent demonstrates that those parties themselves view the rights subject to dismissal as belonging, at least in part, to Kvaerner in its own right." Under Alabama law, however, the right-of-control need only be reserved, not exercised. *See Thrash,* 821 So. 2d at 972.

---

[2] The PMA has a choice-of-law clause stating that the "Agreement shall be interpreted and construed in accordance with the laws of the State of Alabama." (App. at 207.)

[3] Kvaerner reaffirmed its duty to protect IPSCO's interests when it entered into the Amending Agreement with IPSCO, which provided that IPSCO and Kvaerner's respective roles in the litigation against Blaine, Liberty Mutual, and Marsh would be governed by Section 4.04(x) of the PMA.

8

Thus, it is of no consequence that IPSCO instructed Kvaerner to give its consent to the settlements. Kvaerner, as IPSCO's agent and pursuant to its agreement to protect IPSCO's interests, was required to do IPSCO's bidding, which included Kvaerner's consenting to the two settlements. Moreover, it was understood that IPSCO conditioned the effectiveness of the settlements on obtaining Kvaerner's consent because Kvaerner was a named party in the Construction and Coverage Actions.

Second, Kvaerner contends that the District Court grossly exaggerated Kvaerner's agency role because the PMA assigned to Kvaerner "the primary responsibility for the management and resolution of claims and disputes between Suppliers and with Suppliers." Yet that statement serves only to confirm Kvaerner's agency status in the Construction and Coverage Actions because Blaine clearly falls within the definition of Supplier.[4]

As IPSCO's agent, Kvaerner owed IPSCO a duty of loyalty. *See Miller v. Jackson Hosp. & Clinic,* 776 So. 2d 122, 124 (Ala. 2000) ("The principal-agency relationship is fiduciary in nature and imposes upon the agent a

duty of loyalty, good faith, and fair dealing."). That duty of loyalty required Kvaerner to protect IPSCO's best interests. Once IPSCO made it known that it had reached a settlement with Liberty Mutual and Marsh, Kvaerner was under a duty to effectuate IPSCO's wishes and consent to the settlements. *See Am. Armed Servs. Underwriters, Inc. v. Atlas Ins. Co.,* 108 So. 2d 687, 694-95 (Ala. 1958) ("An agent sustains a position of trust toward his principal and in all transactions affecting the subject of his agency, the law dictates that he must act in the utmost good faith . . . .").

Kvaerner's duty of loyalty surmounted what could be considered as a conflict of interest. The "conflict" arose because Liberty Mutual had issued a wasting policy. At the time that IPSCO entered into the proposed settlements with Marsh and Liberty Mutual, Liberty Mutual had already paid out approximately $5 million under the policy to Kvaerner to reimburse it for defense costs that Kvaerner had incurred in the Alabama litigation. Because the Alabama litigation had not yet ended, Kvaerner had a self-interest in ensuring that funds remained available under the policy to continue paying for Kvaerner's future defense costs. Because it was a "wasting" policy, however, each dollar spent on Kvaerner's defense costs reduced the $20 million policy dollar-for-dollar. At the same time, IPSCO was fully aware that the amount available under the policy to pay for any judgment that might be rendered in the Coverage

---

[4] The PMA defines "Suppliers" as persons, firms or corporations performing, providing or delivering services, supplies, or labor on the project. (App. at 206.)

9

Action was decreasing on a daily basis. Indeed, as we have noted, Liberty Mutual's policy was already depleted by $5 million and only $15 million remained. Thus, it was in IPSCO's interests to reach a settlement with Liberty Mutual sooner rather than later. Even though such a settlement was adverse to Kvaerner's interests, Kvaerner was required, as the protector of IPSCO's interests, to resolve any such conflicts in IPSCO's favor.

Kvaerner contends, however, that, even apart from the defense costs, it had an independent financial interest in the outcome of the Construction and Coverage Actions and therefore could not be forced to consent to the settlements. Kvaerner emphasizes that any funds recovered by IPSCO in a settlement or a court judgment would be applied, under the Construction Action Settlement, as a credit against the "Aggregate Cost." Because the Aggregate Cost of the project will ultimately determine whether Kvaerner must pay IPSCO a penalty for exceeding the $182 million Guaranteed Maximum Price, Kvaerner contends that the size of the settlement with Liberty Mutual and Marsh will ultimately have a financial effect on Kvaerner: it will either decrease the penalty Kvaerner must pay to IPSCO or it will increase the bonus IPSCO must pay to Kvaerner.

We acknowledge that the size of the settlement will have an indirect effect on Kvaerner, but it does not follow that

Kvaerner is permitted to place its own interests ahead of IPSCO's interests, even if Kvaerner believed that IPSCO was settling for too little.[5]

Courts have, in somewhat analogous situations, approved settlements over the objections of named parties. Of course, motions to approve settlements most often arise in the class

_____

[5] Kvaerner believes that IPSCO settled with Liberty Mutual for an inadequate amount ($6 million) because the Construction Action Settlement had provided that IPSCO and Kvaerner could enter a $26 million judgment against Blaine if the arbitration panel ruled that Blaine was liable. Blaine was judgment proof and therefore any funds to pay for the $26 million judgment would have to come from Blaine's insurers (i.e., Liberty Mutual).

At the time of the settlements, the maximum possible recovery against Liberty Mutual was already limited to $15 million ($20 million policy limit minus $5 million spent on Kvaerner's defense costs). But in order for IPSCO to recover from Liberty Mutual, two things had to happen. First, the arbitration panel had to find that Blaine was liable and, second, Blaine had to succeed in its lawsuit against Liberty Mutual. Given the risks inherent in those two events and the $15 million cap, a $6 million settlement does not strike us as unreasonably small.

action context, but they occasionally come up in "ordinary" lawsuits as well. For example, in *Liberate Technologies LLC v. Worldgate Communications, Inc.,* 133 F. Supp. 2d 357 (D. Del. 2001), a company by the name of SMI Holdings, Inc. filed a patent infringement suit against Worldgate Communications, Inc. in the District of Delaware. *Id.* at 358. While the lawsuit was pending, SMI Holdings sold the patents to Liberate Technologies LLC and asked the District Court to substitute Liberate Technologies as the plaintiff. *Id.* at 359. SMI Holdings remained a party to the action, however, because of certain counterclaims that had been filed against it by Worldgate Communications. *Id.* at 358 n.1.

Some time later, Worldgate Communications and Liberate Technologies settled the patent infringement claims, but SMI Holdings refused to allow the lawsuit to be dismissed because it objected to the settlement agreement. Even though it no longer held title to the patents, SMI Holdings argued, among other things, that it was not adequately represented in the settlement negotiations. The District Court found this argument unpersuasive, noting that there was "strong evidence" that SMI Holdings had given Liberate the sole right "'to not only try and settle out the patent claims but to settle out the counterclaims that were brought.'" *Id.* at 359. Consequently, the district court granted the motion to approve the settlement. *Id.* at 360.

Kvaerner contends that the *Liberate* decision is "readily distinguishable" on the ground that, unlike the original patent holder in *Liberate,* Kvaerner "never relinquished its claims against Blaine." We cannot agree. First, not only had Kvaerner agreed in the PMA that it would place IPSCO's interests ahead of its own with respect to managing litigation with suppliers, but it had unequivocally agreed that it would protect IPSCO's interests as it concerned liens and disputes. Second, both the Amending Agreement and the Construction Action Settlement specifically state that any funds recovered against Blaine or its insurers would be paid directly and only to IPSCO.

Thus, notwithstanding Kvaerner's inclusion in the caption of the Construction Action Complaint as a co-plaintiff, the real, and indeed the only, party-in-interest in the Construction and Coverage Actions was IPSCO and Kvaerner could not veto or affect the Settlement Agreements.

## III.

Kvaerner complains that the District Court approved IPSCO's motion to approve the Marsh Settlement without giving Kvaerner a reasonable opportunity to respond. As we previously mentioned, IPSCO filed the motion to approve the Marsh Settlement two days before oral argument was to be held on IPSCO's previously-filed motion

11

to approve the Liberty Mutual Settlement.

District courts must give a party notice and an opportunity to respond before disposing of a case. *See Neiderhiser v. Borough of Berwick,* 840 F.2d 213, 216 n.6 (3d Cir. 1988) (criticizing district court for not giving parties opportunity to respond before dismissing lawsuit for lack of subject matter jurisdiction); *Anthuis v. Colt Industries Operating Corp.,* 789 F.2d 207, 211 (3d Cir. 1986) (criticizing district court for granting summary judgment without giving certain parties opportunity to respond).

In this case, we believe the District Court should have given Kvaerner an opportunity to file a brief in response to IPSCO's motion to approve the Marsh Settlement. It does not necessarily follow, however, that the District Court's chosen course of action constitutes reversible error. Kvaerner had an opportunity to respond to the Marsh motion, albeit a limited one, at the previously scheduled oral argument on the Liberty Mutual Settlement. Moreover, IPSCO's motion to approve the Marsh [Coverage] Settlement raised essentially all the same issues that were raised by IPSCO's motion to approve the Liberty Mutual [Construction and Coverage] Settlement. Hence, by presenting arguments as to why the Liberty Mutual Settlement should not be approved, Kvaerner's attorney was also presenting arguments as to why the

Marsh Settlement should not be approved. As a consequence, the District Court's failure to give Kvaerner more time to respond to IPSCO's motion to approve the Marsh [Coverage] Settlement constitutes harmless error.

**IV.**

For the foregoing reasons, we will affirm the District Court's two orders dated June 6, 2003, which approved the Liberty Mutual [Construction and Coverage] Settlement and Marsh [Coverage] Settlement and which dismissed the Construction and Coverage Actions.

12